UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN MUMM,

       Plaintiff,

                                Civil Case No. 14-14403

v.                               Honorable Linda V. Parker

THE CHARTER TOWNSHIP OF SUPERIOR,

       Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On November 17, 2014, Plaintiff Susan Mumm ("Mumm") initiated this lawsuit against her former employer, Defendant Charter Township of Superior ("Township") alleging that the Township paid her less than a male employee for performing substantially equal work and terminated her employment in retaliation for her complaints concerning her unequal pay. Specifically, in an Amended Complaint filed February 5, 2015, Mumm alleges the following claims against the Township: (I) violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d); (II) sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); (III) retaliation in violation of Title VII; (IV) sex discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"); and (V) retaliation in violation of ELCRA. Presently before the

Court is the Township's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56.  The motion has been fully briefed and the Court held a motion hearing on June 22, 2016.  For the reasons that follow, the Court grants the Township's motion.

## I.      Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To

2

demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual and Procedural Background

Mumm began working at the Township in January 1996.  She was hired to fill the position of "on staff accountant" and reported to Township Supervisor William McFarlane.  (*See* Pl.'s Resp., Ex. A at 13-15, 38; Ex. H.)  Mumm never took any college courses in accounting and she is not a certified public accountant; however, through prior office positions, she gained experience handling "accounts receivable and payable, payroll, and general ledger through financial statements." (*Id*., Ex. A at 14; Ex. F.)

Within the first few months of her employment, the Township's outside auditors informed Township Supervisor McFarlane that Mumm did not possess

3

adequate skills for accounting. (Def.'s Mot., Ex. 8; Ex. 5 at 17.) The Township retained Mumm in that position; however, and she received positive employee evaluations over the years. (*See* Pl.'s Resp., Ex. I.) According to her January 17, 1997 evaluation, Mumm "continue[d] to show improvement over past problems" in her accountant's functions. (*Id*. at Pg ID 783.) During her employment, the Township's outside accountants also provided positive feedback regarding Mumm's assistance with the Township's annual audits. (Pl.'s Resp., Ex. J.)

Mumm's job responsibilities increased during her employment with the Township. She identifies her expanded roles as the Township's Human Resources Administrator and its Information Technology ("IT") Administrator. (Pl.'s Resp., Ex. A at 26-27, 34-35, 45-47.) The Township classifies these extensions as part of her general office functions and claims that Mumm was never the head of any Township department.[1] (Def.'s Br. in Supp. of Mot. at Pg ID 93-94.) Over the years, Mumm's salary increased, partially in response to the additional duties she

---

[1] The parties spend a considerable amount of time in their pleadings discussing Mumm's additional responsibilities, including discipline or problems she allegedly experienced with respect to these responsibilities. Mumm alleges, however, that she was not paid the same as a male employee with respect to their accounting functions, only. (*See* Pl.'s Resp. Br. at Pg ID 542 ("the Court should be aware that Plaintiff's case is premised only on Mr. Lockie's [the male comparator] and Ms. Mumm's appointments as Accountants."). Thus the classification of Mumm with respect to her other duties with the Township is not relevant for purposes of deciding her claims and is a distraction from the facts relevant to those claims.

4

assumed.  (*See* Def.'s Br. in Supp. of Mot. at Pg ID 116; *see also* Pl.'s Resp. Ex K.)

During her tenure with the Township, Mumm received four formal disciplinary actions.[2]  The last disciplinary action, which she received on February 14, 2014, paved the way for Mumm's termination.  By this date, Mumm was supervised by the Township's newer Supervisor, Ken Schwartz.[3]  This disciplinary action arose from Mumm's duties in relation to the Township's employee health care plan.

In 2013, the Township changed its employee health care plan from a Health Maintenance Organization ("HMO") to a Preferred Provider Organization ("PPO").  As part of the transition, the Township agreed to maintain Health Savings Accounts ("HSAs") for each employee in which it would deposit a certain amount on a quarterly basis.  Mumm was responsible for performing the accounting functions with respect to the HSAs for employees.  Specifically, she was required to provide the information needed for the Township's third-party

---

[2] Although the Township spends considerable time in its pleadings describing the conduct leading up to the four instances when Mumm was disciplined, only the last disciplinary action is relevant to her claims.  There is nothing in the record suggesting that the earlier disciplinary decisions were considered with respect to the decision to terminate her employment.  As such, the Court is not including the facts relevant to those decisions here.

[3] The Township Board appointed Schwartz as Township Supervisor on October 1, 2014.  (Def.'s Mot., Ex. 2 at 7.)  Schwartz subsequently was elected to the position in November 2014.  (*Id*. at 6.)

health insurance benefits administrator to execute the deposits.  Only three

quarterly payments were to be made in 2013, however, because the new HSA plan

only began in April 2013.

In early 2014, representatives of the Township's Firefighters union

approached Supervisor Schwartz, complaining that the firefighters had received

four deposits into their HSA accounts in 2013 instead of three.  (Def.'s Mot., Ex. 2

at 22-23.)  Some firefighters, in fact, had received five payments.  (*Id*.)  The

firefighters were concerned that there would be negative tax implications because

of the excess payments.  (*Id*.)  In response, Supervisor Schwartz scheduled a

meeting with the Township's third-party health insurance benefits administrator for

February 14, 2014, which Supervisor Schwartz, Township Treasurer Brenda

McKinney, Township Clerk Dave Phillips, Mumm, and a representative from the

third-party administrator attended.  (Def.'s Mot., Ex. 2 at 67.)  During the meeting,

Supervisor Schwartz conveyed the firefighters' complaint to the third-party

administrator, who told Schwartz that if too many deposits were made, it in fact

would constitute a violation of Internal Revenue Service regulations.  (*Id*. at 22-24,

45-47, 67-69.)  During the meeting, Mumm did not reveal that she in fact requested

a fourth deposit into the HSA of all Township employees, as well as a fifth deposit

into some employee's accounts.  (*Id*. at 69.)  When Supervisor Schwartz

subsequently discovered that Mumm in fact had made the additional deposits, he

6

wanted to terminate her employment but Clerk Phillips and Treasurer McKinney "talked [him] down from that."  (*Id*. at 25.)

Prior to this incident, Supervisor Schwartz had become dissatisfied with Mumm's performance of her duties in relation to the Township's IT systems. Mumm was responsible for communicating any problems with those systems (i.e., computers and telephones) to the Township's IT contractor, Parhelion Technologies ("Parhelion").  (Def.'s Mot., Ex. 5 at 45-47.)  Supervisor Schwartz was not able to access his Township e-mail remotely via his laptop and he asked Mumm to contact Parhelion to find out what he had to do to rectify this problem. (*Id*., Ex. 2 at 13-14.)  Several months passed, with Supervisor Schwartz continuing to ask Mumm whether the issue was being resolved.  (*Id*. at 14.)  At some time close to February 14, 2014, Mumm told Supervisor Schwartz that she had spoken with David Donahue at Parhelion, who indicated that remote access could not be done without an upgrade to the Township's computer system.  (*Id*.)  Finding this answer "really bizarre" because he was aware of other Township employees being able to use remote access in the past, Supervisor Schwartz contacted Donahue himself.  (*Id*.)  Donahue informed Supervisor Schwartz that no software upgrade was needed and that he had sent Mumm an email on January 29, 2014, with a link to provide Supervisor Schwartz remote access.  (*Id*. at 14-15; Def.'s Mot., Ex. 21.)

7

Due to Mumm's conduct with respect to the HSA deposits and her IT responsibilities, she was formally disciplined on February 14, 2014, receiving a one-day suspension without pay.  (*Id.*, Ex. 22.)  Mumm was told not to report to work on February 18, 2014.[4]  (*Id.*)  Mumm went to speak with Township Clerk Dave Phillips and Township Treasurer Brenda McKinney after learning of the disciplinary action.  (*Id.*, Ex. 3 at 47.)  According to Phillips, Mumm was very agitated and concerned that she was going to be fired.  (*Id.*)  Phillips and McKinney assured Mumm that she was not going to be fired and that she should rest during her leave from the office and come back to "[s]tart fresh."  (*Id.*)

Despite being suspended, Mumm came to the Township's offices on February 18 in order to file a "Complaint" concerning the disciplinary action.  (*Id.*, Ex. 2 at 50; Ex. 23.)  Although addressing and disputing other criticism Supervisor Schwartz apparently conveyed to Mumm, she does acknowledge in her "Complaint" that she made a mistake with respect to the HSA deposits "due to inexperience" and the "huge amount" of additional duties she had at the time and that she was "negligent" in failing to pass on the remote access information.  (*Id.*, Ex. 23.)  Mumm indicated that "perhaps this HSA administration was one too many HR duties for [her] to take on considering [her] other responsibilities . . .."  (*Id.*)  Mumm nevertheless concluded her "Complaint" by stating that she intended

---

[4] February 14 was a Friday and the upcoming Monday, February 17, was President's Day when the Township's offices would be closed.

to take it to the Township Board and "may hire legal representation." (*Id*.) She requested that her day without pay be rescinded and that the Board review whether Supervisor Schwartz's criticism of her work performance was valid. (*Id*.)

Upon Mumm's return to work on February 19, 2014, Supervisor Schwartz, Clerk Phillips, and Treasurer McKinney met with her to discuss her "Complaint" in accordance with Township procedures. (Def.'s Mot., Ex. 24 at 25; Ex. 5 at 111.) At the meeting, Mumm was told that the Township would shift her HSA duties to Township employee Keith Lockie without reducing her pay, which had been increased because of her assumption of those duties. (*Id*., Ex. 5 at 111-12.) Mumm also was informed that she no longer would be responsible for communicating IT issues with Parhelion. (*Id*. at 112.)

Mumm requested another meeting with Supervisor Schwartz, Clerk Phillips, and Treasurer McKinney on Friday February 21, 2014. (*Id*. at 113.) At his deposition, Schwartz described Mumm at the meeting as "very belligerent towards [himself, Phillips, and McKinney]" and stated that he was struck by "her extreme tone of voice." (Ex. 2 at 41, 61.) Phillips took notes during the meeting, in which he wrote that Mumm "started by saying that she had been badly treated" at the Township and "how unhappy she was for many years" and "couldn't take anymore." (Pl.'s Resp., Ex. Q at Pg ID 820; *see also* Def.'s Mot., Ex. 3 at 45.) She also indicated that she had talked to her family and an attorney and felt she

9

"had a case against the Township." (*Id*.)  Mumm testified at her deposition that what she told Schwartz, Phillips, and McKinney was that she had hired an attorney and was filing a lawsuit against the Township.  (Def.'s Mot., Ex. 5 at 117, 125.) Mumm also testified that she told Schwartz, Phillips, and McKinney at this meeting that she had been underpaid for years in relation to Keith Lockie.  (Def.'s Mot., Ex. 5 at 114-15.)  According to Mumm, she had been verbally complaining about the pay discrepancy between herself and Lockie since before 2005.  (*Id*. at 118.)  Mumm told Schwartz, Phillips, and McKinney that she wanted an annual pay raise of $10,000 or she would quit and wanted one year's severance pay.  (*Id*. at 124; Ex. 2 at 12, 20; Ex. 3 at 15-16; Pl.'s Resp., Ex. Q.)  She indicated that if she did not get her way, she would "shred" their reputations, as well as former Supervisor McFarlane's, before the Township's Board of Trustees.  (*Id*., Ex. 2 at 11; Ex. 4 at 27, 54.)

Phillips was "flabbergasted, totally shocked, and surprised[,]" as he "had no idea [Mumm] was this unhappy, upset, and disgruntled."  (Pl.'s Resp., Ex. Q; *see also* Def.'s Mot., Ex. 3 at 45.)  McKinney and Schwartz likewise were shocked and found Mumm's complaints "unexpected."  (Def.'s Mot., Exs. 2 at 49, Ex. 4 at 26.) Schwartz, Phillips, and McKinney met privately after meeting with Mumm and universally agreed that they could no longer work with Mumm or trust her.  (*Id*. Ex. 2 at 61-63; Ex. 3 at 20; Ex. 4 at 27-28.)  Schwartz told Phillips and McKinney

10

that he wanted to terminate Mumm's employment-- to which McKinney agreed-- but that he wanted to consult with the Township's attorney, Fred Lucas, with respect to the steps they needed to take to do so.  (*Id.*, Ex. 2 at 61, 79; Ex. 4 at 28.)

Schwartz attempted to reach Lucas, but Lucas was not in his office. Schwartz, Phillips, and McKinney therefore went back to Mumm and told her that she was being immediately suspended with pay.  (*Id.*, Ex. 2 at 34; Ex. 5 at 127.)  In the days following her suspension, Mumm submitted three additional "complaints" to the Township.  (Def.'s Mot., Exs. 30-32.)

In "Complaint #2", Mumm raised issues concerning McKinney's past treatment of several Township employees, the discipline Mumm received for leaving work without permission in June 2008, and Phillips' reaction in November 2009 when it was discovered that Mumm had used the Township's account to order chairs from Staples for her personal use (for which she immediately reimbursed the Township).  (Def.'s Mot., Ex. 30.)  Mumm makes one reference in this complaint to being under-compensated, when she indicates that former Supervisor McFarlane told her that McKinney was the main reason McFarlane could not get Mumm a pay raise when Mumm "had repeatedly pointed out to [McFarlane] that [her] pay was inadequate for the duties [she] was performing." (*Id.* at 3.)  Mumm writes that she "repeatedly pointed out to [McFarlane] that there was a huge gap between my salary and Keith Lockie's salary when we had

11

identical job descriptions in terms of our 1/2 accounting positions and equivalent/comparable job duties in the other 50% of our jobs." (*Id.*)

Mumm only refers to being underpaid once in "Complaint #3", in which she simply summarizes the events transpiring since the filing of her initial complaint. (*Id.*, Ex. 31.) When describing her meeting with Schwartz, Phillips, and McKinney on February 21, Mumm writes that she opened the meeting stating that she was willing to withdraw her initial complaint with certain conditions and that she stated: "I have been underpaid for more than a decade and I don't want to endure that anymore, given the increased complexity of my jobs." (*Id.* at 3.) Mumm does not refer to Lockie anywhere in Complaint #3, nor does she allege that she has experienced sex discrimination while working for the Township. (*Id.*)

The apparent purpose of Mumm's last complaint, "Complaint #4", was to lodge her objections to the removal of her human resources and IT duties. (*Id.*, Ex. 32.) In this complaint, Mumm disputes the rationale for the decision to remove these duties from her and claims that she is capable of competently handling them. (*Id.*) Mumm refers neither to her pay, discrimination, nor Lockie in this complaint. (*Id.*)

On Monday, February 24, 2014, Schwartz, Phillips, and McKinney met with the Township's attorney, Lucas, who instructed that a special meeting of the Township Board be scheduled where Schwartz would recommend the immediate

termination of Mumm's employment.  (Def.'s Mot., Ex. 26 ¶ 3.)  Schwartz instructed Lucas to send a letter to Mumm informing her of the Board's special meeting which was scheduled for April 3, 2014, and that she was invited to attend and address the Board.  (*Id*.)  Lucas' letter to Mumm, dated March 5, 2014, informed her of the Board's special meeting and that Supervisor Schwartz would be recommending to the Board that her employment with the Township be terminated immediately.  (Def.'s Mot., Ex. 27 ¶ 6.)  The letter further informed Mumm that she could attend and address the Board.  (*Id*.)  Mumm received Lucas' letter on March 7, 2014.  (*Id*., Ex. 26. ¶ 9.)

On March 13, 2014, Lucas received a letter from Mumm, dated March 11, 2014, in which Mumm indicated that she had filed a complaint against the Township with the Equal Employment Opportunity Commission ("EEOC").  (*Id*. ¶ 10.)  Lucas forwarded the letter to the Township on the day he received it.  (*Id*.)  On March 17, 2014, Supervisor Schwartz contacted Lucas and informed him that the Township had received that day a copy of a Notice of Charge of Discrimination, which Mumm had filed with the EEOC.  (*Id*. ¶ 11.)

The Township's Board of Trustees convened at the scheduled special meeting on April 3, 2014, at which time the Board voted to terminate Mumm's employment.  Lockie assumed Mumm's accounting duties after her termination.  (Pl.'s Resp., Ex. L.)  Upon the recommendation of the Township's outside

13

auditors, the Township's Board of Trustees subsequently approved the addition of the position of Township Controller to oversee all of the Township's accounting functions.  (*Id.*)  Lockie was hired to serve in that capacity.  (*Id.*)

Prior to the consolidation of the Township's accounting duties and her termination, Mumm performed accounting duties in connection with the Township's general ledger.  Lockie performed the accounting duties for the Township's Utility Department and Parks Department.

Lockie was hired by the Township in 1998 to serve as Parks Administrator, in other words to serve as the head of the Township's Parks Department.  (Def.'s Mot., Ex. 6 at 39; *see also* Ex. 5 at 53 (Mumm acknowledging that Lockie was the "head" of the Parks department).)[5]  Before his employment with the Township, Lockie spent approximately twenty-two years working as an accountant.  (*Id.*, Ex. 6 at 36-37.)  Prior to this work, Lockie obtained his Bachelor of Science in Business Management with a minor in Accounting.  (*Id.* at 36.)  He became a certified public accountant ("CPA") in Ohio; however, he let his certification lapse

---

[5] In her response to the Township's motion, Mumm takes issue with the Township's categorization of Lockie as a "department head," claiming that it is "not a phrase that was ever utilized by the Township until its response to [her] EEOC charges."  (*See,* Pl.'s Resp. Br. at Pg ID 562-63.)  Yet during her deposition in this matter, Mumm herself uses the term repeatedly to refer to hers and Lockie's positions within the Township, acknowledging that even if the phrase was not used, this was the role being served.  (*See, e.g.*, Def.'s Mot., Ex. 5 at 39, 43, 44, 53-54.)

sometime before his employment with the Township, as it was not a requirement of any of his previous jobs.  (*Id*. at 38-39.)

As the Township's Park Administrator, Lockie was responsible for reporting to the Township's elected Parks Commission, overseeing the maintenance of the Township's nine park facilities, conservancy property, and recreation programs, and writing and administering park grants.  (*Id*. at 40-41; Ex. 4 at 46.)  Lockie also supervised one and ultimately three year-round Parks Department employees and several seasonal employees.  (*Id*., Ex. 6 at 41.)  In 2002, the Township added to Lockie's duties and he assumed the accounting functions for the Township's Utility Department.[6]  (*Id*. at 42.)  Referring to the job descriptions for their accounting positions, Mumm contends that her accounting duties were identical to Lockie's accounting duties.  (Pl.'s Resp. Br. at Pg ID 551.)  Lockie testified that in practice, however, there were distinctions between the accounting functions for the Utility Department, which he performed, and the general Township accounting functions, which Mumm performed:

---

[6] In 2013, Lockie took over full responsibility for the Township's Utility Department as its Director.  (Def.'s Mot., Ex. 6 at 11-12.)  As noted earlier, however, Mumm is comparing herself and Lockie with respect to their accounting duties, only.  (Pl.'s Resp. Br. at Pg ID 567 ("The fact that Ms. Mumm and Mr. Locke each had separate functions besides their Accounting positions is of no consequence.  Ms. Mumm's [equal pay claim] is based on the salary she received as a part-time Accountant for the Township and the salary that Lockie received as a part-time Accountant for the Township."))  Therefore, the Court finds it unnecessary to set forth the duties and responsibilities Lockie assumed when he became Utility Department Director.

15

> The utility department is not a government fund, it is a proprietary
> fund, also called an enterprise fund.  So it has full accrual accounting,
> it has full liability, which the government does not, it has fixed assets
> and depreciation, which the government funds do not.

(*Id*.)  Lockie testified that the skills required to perform the Utility Department's

accounting was different than those required for the general fund's accounting

". . . because of the full accrual accounting and the reconciling with the bonding

agent and the fixed assets system and depreciation, which government accounting

does not have . . .." (*Id*. at 43.)  During his deposition, Township Clerk Phillips

also noted the distinction between the accounting for the Township's general fund

and its Utility Department, as well as Lockie's superior accounting skills in

comparison to Mumm.  (*Id*., Ex. 3 at 57-59.)  Township Treasurer McKinney

explained that, in comparison to Lockie's accounting responsibilities, Mumm had

less responsibility and a lot of her work was simply data entry.  (*Id*., Ex. 4 at 49.)

The funds to pay Lockie's annual salary were derived from different

Township funds, as his duties encompassed different departments.  (*Id*. at 37.)  In

other words, the Parks Department and Utility Department each funded a portion

of his salary.  (*Id*. at 55-56.)  Similarly, when Mumm performed accounting duties

for different departments, those departments had to contribute funds for that work.

(*Id*. at 56.)  Lockie and Mumm, however, received only one annual salary for the

work they performed for the Township.  (*See* Def.'s Mot., Exs. 33, 34.)  As set

forth in Defendant's motion for summary judgment, their salaries compared as follows:

| YEAR | SUSAN MUMM | KEITH LOCKIE |
|------|------------|--------------|
| 1998 | $ 30,180.54 | $   9,788.66 |
| 1999 | $ 31,146.34 | $ 23,699.97 |
| 2000 | $ 34,275.96 | $ 23,327.00 |
| 2001 | $ 35,646.97 | $ 22,635.89 |
| 2002 | $ 40,552.17 | $ 25,104.62 |
| 2003 | $ 42,050.02 | $ 27,484.11 |
| 2004 | $ 45,699.74 | $ 57,120.00 |
| 2005 | $ 45,548.19 | $ 55,952.00 |
| 2006 | $ 46,867.54 | $ 58,409.50 |
| 2007 | $ 48,877.98 | $ 60,161.85 |
| 2008 | $ 48,461.12 | $ 61,938.59 |
| 2009 | $ 50,735.00 | $ 63,796.62 |
| 2010 | $ 51,934.56 | $ 65,072.87 |
| 2011 | $ 52,972.52 | $ 66,373.44 |
| 2012 | $ 53,010.32 | $ 65,958.96 |
| 2013 | $ 55,051.37 | $ 72,579.88 |

(Def.'s Br. in Supp. of Mot. at Pg ID 116; *see also* Ex. 33.)  Nothing in the record reflects an amount either individual received for only their performance as Township accountants.

## III.    Applicable Law and Analysis

As Mumm makes clear in response to the Township's summary judgment motion, she is claiming violations of the Equal Pay Act, Title VII and ELCRA because she believes the Township discriminated against her because of her sex. (Pl.'s Resp. Br. at Pg ID 542.)  Specifically, Mumm believes that the Township violated the law "because she was a part-time Accountant for the Township while a

17

male part-time Accountant was performing substantially equal work for the Township yet being paid substantially more." (*Id*.)  In other words, "[Mumm]'s case is premised only on Mr. Lockie['s] and Ms. Mumm's appointments as Accountants." (*Id*.)

### A.    Equal Pay Act

A plaintiff alleging a violation of the Equal Pay Act bears the initial burden of showing that the defendant "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).  "Equal work" does not require the jobs to be identical.  *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (citing *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir. 1970)).  "Instead, to effectuate the remedial purposes of the Equal Pay Act, only substantial equality of skill, effort, responsibility and working conditions is required." *Id*.  "[E]xperience and training are relevant to the determination of 'skill' in suits under the Equal Pay act." *Thomas v. Owen Elec. Coop., Inc.*, 121 F. App'x 598, 603 (6th Cir. 2005).  Specifically, the Code of Federal Regulations states in relevant part:

> Where the amount or degree of skill required to perform one job is substantially greater than that required to perform another job, the equal pay standard cannot apply even though the jobs may be equal in all other respects. Skill includes consideration of such factors as

18

experience, training, education, and ability. It must be measured in terms of the performance requirements of the job. If an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the EPA as jobs the performance of which requires equal skill, even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his or her working time as the employee in the other job. Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill. The efficiency of the employee's performance in the job is not in itself an appropriate factor to consider in evaluating skill.

29 C.F.R. § 1620.15(a).

If the plaintiff demonstrates that she has been paid unequally for equal work, " 'the burden shifts to the employer to show that the differential is justified under one of the Act's four exemptions.' " *Odomes*, 653 F.2d at 251 (quoting *Corning Glass Works*, 417 U.S. at 196). Under the Equal Pay Act, unequal pay will not violate the statute where "payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]" 29 U.S.C. § 206(d)(1). The fourth exemption " 'does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.' " *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005) (quoting *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988) (emphasis in original)). "A wage differential based on education or experience is a factor other than sex for purposes of the Equal Pay Act." *Id.* The defendant's burden to show that an

19

exception applies is a heavy one, as the defendant must show that "'sex provides no part of the basis for the wage differential.' " *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 844 (6th Cir. 1997) (emphasis added) (quoting *Brennan v. Owensboro-Daviess Cnty. Hosp.*, 523 F.2d 1013, 1031 (6th Cir. 1975)); *see also Balmer*, 423 F.3d at 612 ("In order to be entitled to summary judgment, the defendant must prove that there is no genuine issue as to whether the difference in pay is due to a factor other than sex.").

Mumm's Equal Pay Act claim fails because she cannot demonstrate that she and Lockie were performing "equal work." While Mumm establishes that she and Lockie were "accountants" for the Township, the record evidence reflects that Lockie performed accounting work requiring a substantially greater amount or degree of skill. Mumm points to the job descriptions for the two accounting positions, contending that they reveal that she and Lockie "performed the same accounting functions." (*See* Pl.'s Resp. Br. at Pg ID 551, citing Exs. 14, 15.) However, "[a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." *Hodgson v. Miller Brewing Co.*, 457 F. 2d 221, 227 (7th Cir. 1972) (quoting 29 C.F.R. § 800.121); *see also Epstein v. Secy., U.S. Dep't of the Treas.*, 739 F.2d 274, 277 (7th Cir. 1984) (citation omitted) ("job descriptions are not determinative of equal work, but, rather, . . . the court must weigh the nature of the

20

actual duties performed by the two employees"); *see also Brennan v. Owensboro-Daviess Cnty. Hosp.*, 523 F.2d 1013, (6th Cir. 1975). The fact that Mumm may have shared the same job title with Lockie therefore is insufficient to establish that they performed "equal work."

Mumm fails to refute Lockie's, Phillips' and McKinney's testimony that the accounting required for the Utility Department demands greater skills than those required for the Township's general ledger and that Mumm's work involved mostly data entry. Mumm had a limited background in accounting when she came to the Township, and had taken no college accounting courses. Lockie, in comparison, had a Bachelor's Degree in Business Management, with a minor in Accounting and he, at least at one time, took and passed the CPA exam and was a licensed CPA. Lockie also had years of experience working as an accountant. However, even if the Court concluded that Mumm and Lockie performed equal work, it still would find that Mumm has not established a prima facie case under the Equal Pay Act because she has not shown that the Township compensated her and Lockie disproportionately for that work.

As stated already, Mumm's Equal Pay Act claim is premised on the pay she and Lockie received in their Township "accountant" positions, only. Yet Mumm has not shown that Lockie was paid more than Mumm for his accountant duties. The only salary figures Mumm presents as evidence are hers and Lockie's *total*

21

annual salaries for *all* of their Township responsibilities.  While Mumm presents evidence suggesting that the different Township departments were "charged" for the work Mumm and Lockie performed for the department, she has offered absolutely no evidence to show that they received "separate" accounting salaries, much less what those salaries were.[7]  At the motion hearing, Mumm's counsel acknowledged that the Township does not have a formula for calculating Mumm's and Lockie's "accounting" salaries, and counsel seemed to acknowledge that Mumm lacks evidence to present to a jury on what their alleged separate accounting salaries were.

Thus, while the Township may have paid Lockie a total annual salary greater than it paid Mumm, Mumm has not shown that the Township compensated Lockie more for the portion of their job duties which she alleges are comparable. As a result-- and contrary to Mumm's claim in response to the Township's motion-- it is not "undisputed that Ms. Mumm was paid less by the Township for her part-time Accounting position than Mr. Lockie was paid by the Township for his part-time Accounting position."  (Pl.'s Resp. Br. at Pg ID 566.)  In fact, Mumm fails to present evidence to create a genuine issue of material fact with respect to this issue.

_____

[7] The evidence Mumm offers suggests that funds were allotted from the budgets of different Township departments based on the work Mumm and Lockie performed for those departments to contribute toward their annual salaries.  This does not mean that Mumm and Lockie received separate "accountant" salaries, or that the amount contributed for their accounting work is the amount of their "accountant" salaries.

Thus, the Court concludes that the Township is entitled to summary judgment on Mumm's Equal Pay Act claim (Count I).

**B.** **Title VII and ELCRA**

Title VII provides, in pertinent part, that "[i]t shall be unlawful for an employer . . . to discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Michigan's ELCRA similarly prohibits employers from discriminating against any individual on the basis of gender. Mich. Comp. Laws § 37.2202. Claims brought under Title VII and ELCRA are analyzed under the same evidentiary framework. *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

"A claim of disparate pay for equal work is essentially the same whether pursued under Title VII or the Equal Pay Act. *Odomes*, 653 F.2d at 250; *see also Conti*, 50 F. App'x at 698 (citing *Henry v. Lennox Indus., Inc.*, 768 F.2d 746, 752 (6th Cir. 1985)). "The plaintiff must ordinarily show that the employer paid different wages to employees of opposite sexes for substantially equal work." *Conti*, 50 F. App'x at 698. Nevertheless, the failure to demonstrate the elements of an Equal Pay Act claim does not necessarily preclude a plaintiff from prevailing under Title VII. *Id.* (citing *County of Washington v. Gunther*, 452 U.S. 161 (1981)).

23

In *Gunther*, the Supreme Court held that a plaintiff could demonstrate a Title VII violation even if no member of the opposite sex holds an equal but higher paying job, provided the Equal Pay Act's four exemptions do not apply.  452 U.S. at 168.  To prevail, a Title VII plaintiff "must . . . produce some other evidence which shows that [the defendant] discriminated against her in terms of her salary because of her gender."  *Conti*, 50 F. App'x at 698.

The plaintiff can make this showing using either direct or circumstantial evidence supporting an inference of discrimination.  *Id*. at 699 (citing *Kline v. TVA*, 128 F.3d 337, 348 (6th Cir. 1997)).  Where the plaintiff lacks direct evidence of discrimination, the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), applies.  *Conti*, 50 F. App'x at 699.  The plaintiff has the initial burden of establishing a prima facie case of discrimination by showing: (1) she is a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) she was treated differently from similarly situated employees outside of the protected class.  *Id*.  "In a Title VII case where the plaintiff seeks to compare herself to another employee, she must prove that all relevant aspects of her employment situation were similar to those of the other employee."  *Id*. (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

24

For the reasons discussed in the previous section, Mumm fails to demonstrate that she was treated differently (i.e., compensated less) than a similarly situated, male employee.  She also has not come forward with any evidence to suggest that the Township would have paid her more if she were a male.  As such, the Township also is entitled to summary judgment with respect to Plaintiff's Title VII and ELCRA discrimination claims (Counts II and IV).

## C.    Retaliation

Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  A plaintiff claiming a violation of this provision must prove her case through direct evidence of retaliation or by establishing a prima facie case under the *McDonnell Douglas* framework.  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).  The same legal framework applies to a retaliation claim brought under Michigan's ELCRA.  *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013).

To demonstrate a prima face case of retaliation, the plaintiff must prove by a preponderance of the evidence that "1) [s]he engaged in activity that Title VII protects; 2) [the] defendant knew that [s]he engaged in this protected activity; 3)

25

the defendant subsequently took an employment action adverse to the plaintiff; and

4) a causal connection between the protected activity and the adverse employment

action exists." *Abbott*, 348 F.3d at 542 (citations omitted).  With respect to the

fourth factor, "Title VII retaliation claims must be proved according to traditional

principles of but-for causation . . ..  This requires proof that the unlawful retaliation

would not have occurred in the absence of the alleged wrongful action or actions of

the employer." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, -- U.S. --, 133 S.

Ct. 2517, 2533 (2013).

 If the plaintiff presents a prima facie case of retaliation, " 'the burden of

production shifts to the defendant to articulate a legitimate, non-discriminatory

reason for the adverse action.' " *Abbott*, 348 F.3d at 542 (quoting *Nguyen v. City*

*of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)).  If the defendant presents a

legitimate, non-discriminatory reason, the plaintiff "must then demonstrate that the

proffered reason was a mere pretext for discrimination by establishing that the

proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse

action; or 3) was insufficient to motivate the adverse action." *Id*.  (citation

omitted).

 Ultimately, " '[p]retext is a commonsense inquiry: did the employer fire the

employee for the stated reason or not?' " *Montell v. Diversified Clinical Servs.,*

*Inc.*, 757 F.3d 497, 508 (6th Cir. 2014) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d

394, 400 n.4 (6th Cir. 2009)).  " 'At the summary judgment stage, the issue is

whether the plaintiff has produced evidence from which a jury could reasonably

doubt the employer's explanation.  If so, her prima facie case is sufficient to

support an inference of discrimination at trial.' "  *Id*.  "But summary judgment is

proper if, based on the evidence presented, a jury could not reasonably doubt the

employer's explanation."  *Chen*, 580 F.3d at 400 n.4 (citing *Reeves v. Sanderson*

*Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

The Township contends that it is entitled to summary judgment with respect

to Mumm's retaliation claims because Township Supervisor Schwartz, Clerk

Phillips, and Treasurer McKinney decided to terminate Mumm's employment on

February 21, four days *before* she filed her EEOC claim.  Thus the Township

maintains that the process was in motion to terminate Mumm when she filed her

claim.

The Supreme Court expressed a concern in *Nassar* "that employees who see

the proverbial writing on the wall that they are about to be fired should not be able

to use Title VII protections to insulate themselves from adverse employment

actions that were previously contemplated."  *Montell*, 757 F.3d at 507 (citing

*Nassar*, 133 S. Ct. at 2532) ("[A]n employee who knows that he or she is about to

be fired for poor performance, . . . [t]o forestall that lawful action, . . . might be

tempted to make an unfounded charge of racial, sexual, or religious discrimination;

27

then, when the unrelated employment action comes, the employee could allege that

it is retaliation.").  To balance this concern with the legal protections Title VII

affords, Supreme Court and Sixth Circuit precedent instruct that "[w]hen the

employer 'proceeds along lines previously contemplated,' [the court] must not take

the temporal proximity of the adverse employment action as evidence of

causality." *Montell*, 757 F.3d at 507 (brackets omitted) (quoting *Clark Cnty. Sch.*

*Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).  In other words:

> "[A]n employer proceeding along lines previously contemplated,
> though not yet definitively determined, is no evidence whatever of
> causality," [*Breeden*, 532 U.S. at 272]. . . . but where an employer
> deviates from those lines, temporal proximity can certainly be
> evidence of causality. . . . courts must determine what made [the
> employer] fire [the employee] *when it did*. . . . Thus, [the court] must
> analyze the evidence of how and when the adverse employment action
> occurred to determine whether it squares with the action previously
> contemplated.  If it does, then temporal proximity is not evidence of
> causality, but if the adverse employment action is unlike the action
> previously contemplated or does not occur on the schedule previously
> laid out, then the temporal proximity of the adverse action to the
> protected conduct is certainly evidence of causation.

*Montell*, 757 F.3d at 507 (additional quotation marks and citations omitted)

(brackets added).

The Township presents evidence to show that after meeting with Mumm on

February 21, 2014-- before she filed her EEOC claim-- Schwartz, Phillips, and

McKinney put the process in motion to terminate her and the Township simply

proceeded along those lines after receiving notice of Mumm's EEOC filing.  In

28

response to the Township's argument, however, Mumm contends that she engaged in protected activity during the February 21 meeting with Schwartz, Phillips, and McKinney. Specifically, Mumm argues that she complained of sex discrimination with respect to her pay during the meeting and threatened to file a lawsuit against the Township. (Pl.'s Resp. Br. at Pg ID 570.) If Mumm is correct, the Township's argument fails.

Title VII's prohibition against retaliation covers more than the employee who files an EEOC claim. *See* 42 U.S.C. § 2000e-3(a). The statute protects employees who have either (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* "Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice." *Yazdian v. Conmed Endoscopic Tech., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citation omitted). In fact, the Sixth Circuit has held that the statute's "opposition" clause encompasses an employee's complaint of unlawful activity to her supervisor. *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (holding that "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII"); *see also Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (citation omitted) ("When an employee

29

communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity."). The employee's complaint need not " 'be lodged with absolute formality, clarity, or precision' " to constitute protected activity under Title VII's opposition clause. *Yazdian*, 793 F.3d at 645 (quoting *Stevens v. Saint. Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)). As one district court has remarked, "[e]mployees often do not speak with the clarity or precision of lawyers." *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560 (D. Kan. 1995).

Nevertheless, "[a]n employee may not invoke the protections of [Title VII] by making a vague charge of discrimination." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). "[E]mployers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination." *Garcia-Paz*, 873 F. Supp. at 560. "The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Id*.

In *Fox v. Eagle Distributing Company*, 510 F.3d 587 (6th Cir. 2007), the Sixth Circuit held that the plaintiff did not engage in protected activity when he

30

mentioned suing his employer, claimed that "upper management [was] out to get him," and complained about not getting promoted, but never stated that he was denied the promotion due to age discrimination or that the employer engaged in any unlawful employment practice. *Id.* at 592. In comparison, the Sixth Circuit found that the plaintiff's reference to a "hostile work environment" in his complaint put his employer on notice that he believed his supervisor's conduct was illegal because " '[h]ostile work environment' is a term of art, which refers to an unlawful employment practice under Title VII . . ." and the context in which the statement was made revealed that the plaintiff was "using the expression to complain about repeated abusive discriminatory comments or treatment." *Yazdian*, 793 F.3d at 646.

Mumm admittedly did not use the term "sex discrimination" during her February 21 meeting with Schwartz, Phillips, and McKinney. (*See* Def.'s Mot., Ex. 5 at 116-17.) The Township maintains that, viewing the evidence in a light most favorable to Mumm, she at most said during the meeting that she had hired an attorney and would sue the Township if she did not get an immediate $10,000 raise or a year's severance pay. (Def.'s Reply Br. at Pg ID 860.) This seems to be too narrow of a reading of Mumm's testimony. The Court finds that she at least communicated to Schwartz, Phillips, and McKinney (1) a complaint about being paid less than Lockie (a male employee), (2) that she had hired a "labor attorney",

31

and (3) a threat to sue the Township or that she was filing a lawsuit.[8] (*See* Def.'s Mot., Ex. 5 at 114-117, 124-126.)

Nevertheless, the Court finds Mumm's comments too vague to put the Township on notice that she was claiming gender discrimination. The fact that Mumm complained about being paid less than Lockie-- who happened to be male-- did not sufficiently convey that Mumm believed the Township was acting in an unlawful discriminatory manner as opposed to simply being unfair. *See Liu v. Sterigenics Int'l*, No. CV-07-5976, 2008 WL 4657778, at *8 (C.D. Calif. Oct. 16, 2008) (unpublished) (finding the plaintiff's comment that it was "unfair" that she and a male employee purportedly did the same job and held different titles insufficient to convey to her employer that she was complaining about gender discrimination). Perhaps tellingly, in the notes Mumm prepared prior to her February 21 meeting with Schwartz, Phillips, and McKinney about what she wanted to say at the meeting, Mumm never refers to sex or gender discrimination, nor does she express a belief that she was compensated less than Lockie or otherwise treated unfairly because she is a woman. (Def.'s Mot., Ex. 25.) Mumm

---

[8] Prior to their meeting on February 21, 2014, Mumm prepared notes about what she wanted to say to Schwartz, Phillips, and McKinney. (*See* Def.'s Mot., Ex. 5 at 113, Ex. 25.) At the motion hearing, Mumm's attorney read from these notes to represent what Mumm said at the meeting and to demonstrate that she engaged in protected conduct. Mumm testified at her deposition, however, that she did not distribute her notes at the meeting and that the notes do not accurately reflect what she said at the meeting. (*Id.*, Ex. 5 at 113.)

only refers to being subjected to "abuse," "serious mismanagement," and "repeat[ed] mistreat[ment]." *Id.*

Further, while Mumm testified during her deposition that she had complained about being paid less than Lockie for years (*id.*, Ex. 5 at 118), there is no evidence that she ever communicated a belief that her gender was the basis for the pay disparity. In fact, in the only written complaint about her compensation that Mumm submitted to the Township before the decision was made to terminate her employment, she simply asserted that she deserved more pay as a result of having assumed more job responsibilities over the years and that she was under-compensated when compared to Lockie *and a female* Township employee who she believed had comparable job duties and seniority. (Def.'s Mot., Ex. 11.) Notably, even in the complaints Mumm submitted after Schwartz, Phillips, and McKinney decided to terminate her employment, she never asserted that the disparity in pay was based on gender.

On this record, a jury could not reasonably conclude that Mumm sufficiently communicated a complaint of gender discrimination to the Township prior to or during her February 21 meeting with Schwartz, Phillips, and McKinney. As such, the Court finds that the decision to terminate Mumm preceded her protected activity. Because the Township simply continued along lines contemplated before Mumm filed her EEOC complaint, she cannot establish a causal connection to state

33

a prima facie case of discrimination.  However, even if Mumm engaged in
protected activity during the February 21 meeting, the Court still would conclude
that the Township is entitled to summary judgment with respect to her retaliation
claims.

 If Mumm engaged in protected activity at the February 21 meeting and
Schwartz, Phillips, and McKinney decided that same day to terminate her
employment-- which they undisputedly did-- Mumm would sufficiently present a
prima facie case of retaliation.  This is because, contrary to the Township's
assertion (*see* Def.'s Br. in Supp. of Mot. at Pg ID 124), temporal proximity is
sufficient to establish a causal connection *for purposes of demonstrating a prima
facie case of retaliation.  Montell*, 757 F.3d at 505 ("Where an adverse
employment action occurs very close in time after an employer learns of a
protected activity, such temporal proximity between the events is significant
enough to constitute evidence of a causal connection for the purposes of satisfying
a prima facie case of retaliation."); *see also DeNoma v. Hamilton Cnty. Court of
Common Pleas*, 626 F. App'x 101, 110-111 (6th Cir. 2015) ("A plaintiff can meet
her burden on the causation element [of her prima facie case] by showing very
close temporal proximity between an employer's first knowledge of the plaintiff's
protected activity and the adverse employment action.").  Nevertheless, the

34

Township states a legitimate, non-retaliatory reason for terminating Mumm's employment.

As the Township's attorney repeated at the motion hearing, the decision to terminate Mumm resulted from Schwartz's, Phillips', and McKinney's loss of trust in Mumm, which culminated at the February 21 meeting after a number of prior instances of misconduct by Mumm.  (*See also* Def.'s Br. in Supp. of Mot. at Pg ID 124-26.)  During his deposition, Schwartz testified that he had wanted to terminate Mumm earlier in February when he learned of her mistakes in connection with the Township's HSA payments, but Phillips and McKinney persuaded him not to do so.  (Def.'s Mot., Ex. 2 at 25.)  Phillips testified that there was a "total lack of confidence and trust in [Mumm]" as a result of the February 21 meeting, but "[t]here was a big buildup to this."  (*Id*., Ex. 3 at 20.)  Phillips explained:

> This was not just something that everything was going along very smoothly and we had one meeting out of the blue moon.  This has been something-- issues with the HSA and with the phones and the email had been just gathering steam for several weeks.  It was a lot of corrective action issues going on and being considered for the prior two or three weeks.  This was just sort of like the last straw, I guess.

(*Id*.)  Therefore, Mumm can prevail only if she shows that those reasons were a pretext for retaliation.

At the motion hearing, Mumm's counsel made two arguments to demonstrate pretext.  First, he pointed to the temporal proximity between Mumm's protected conduct and the decision to terminate her employment.  Next, he argued

35

that Mumm's prior misconduct could not have possibly motivated the decision

because it previously was not deemed sufficient to justify her termination.  As

counsel noted, immediately upon learning of the fourth disciplinary action she

received on February 14, 2014, Mumm went to Phillips and McKinney who

assured Mumm that she was not going to be fired.  (Def.'s Mot., Ex. 3 at 47.)

Mumm's counsel ignores, however, that Supervisor Schwartz wanted to

terminate Mumm as a result of the misconduct that led to the fourth disciplinary

action.  (Def.'s Mot., Ex. 2 at 25.)  Moreover, his argument ignores what fully

transpired at the February 21 meeting.  Specifically, after being disciplined for

lying to the Township Supervisor, mismanaging the Township's HSAs, and

admitting that she had been negligent, Mumm came to the meeting demanding a

$10,000 raise or the option to quit with one year's severance pay.  She also

threatened that if she did not get her way, she would "shred" the reputations of

Schwartz, Phillips, McKinney, and former Supervisor McFarlane, before the

Township's Board of Trustees.  (*Id*. at 11; Ex. 4 at 27, 54.)  Schwartz remarked on

Mumm's "belligeren[ce]" and "extreme tone of voice" at the meeting.  (*Id*., Ex. 2

at 41, 61.)  Phillips was "flabbergasted, totally shocked and surprised" by Mumm's

expressions of how "unhappy and disgruntled" she was.  (*Id*., Ex. 3 at 16, 45.)

McKinney also was "shocked" by Mumm's behavior at the meeting and, like

36

Shwartz and Phillips, lost "all trust" in Mumm as a result.  (*Id*. at 22, 24, 55; *see also id*., Ex. 2 at 61, 81; Ex. 3 at 20.)

In short, Mumm has not shown that the Township's proffered reason for her termination did not actually motivate its decision or was insufficient to explain the decision.  This leaves her with the temporal proximity between her protected conduct and the decision to terminate her employment.  In the Sixth Circuit, however, " 'the law . . . is clear that temporal proximity cannot be the sole basis for finding pretext.' "  *Amos v. McNairy Cnty*., 622 F. App'x 529 (6th Cir. 2015) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).  As such, the Court finds that Mumm fails to produce evidence from which a jury could reasonably doubt the Township's non-retaliatory explanation for deciding to terminate her employment.  *Montell*, 757 F.3d at 508.

For these reasons, the Court concludes that the Township also is entitled to summary judgment with respect to Mumm's retaliation claims (Counts III and V).

Accordingly,

**IT IS ORDERED**, that Defendant Charter Township of Superior's Motion for Summary Judgment is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 12, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, July 12, 2016, by electronic and/or U.S. First Class mail.

s/ Kelly Winslow for Richard Loury
Case Manager
